# AFFIDAVIT

I, Dominic Gross, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I have been a Special Agent of the Federal Bureau of Investigation ("FBI") since July 2015. As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States. I am currently assigned to the Economic Crimes Squad in the FBI's Boston Field Office, where I investigate possible violations of federal law, including wire fraud, bank fraud, money laundering, intellectual property rights violations, bankruptcy fraud, and mortgage fraud. I have received on-the-job training as well as FBI-sponsored training related to these types of investigations, and I have participated in the execution of arrest warrants.

2. I am currently investigating NORMAN HIGGS ("HIGGS") for his involvement in the theft of government property, bank fraud, conspiracy to commit wire fraud, and money laundering, in violation of Title 18, United States Code, Sections 641, 1344, 1349, and 1957, respectively ("the Target Offenses").

3. I make this affidavit in support of an application for a criminal complaint charging HIGGS with the Target Offenses, and for a warrant for HIGGS' arrest.

4. Based on the facts set forth below, there is probable cause to believe that HIGGS committed the Target Offenses.

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience investigating financial crimes, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show that there is sufficient probable cause to support the issuance of the requested complaint and arrest warrant. It does not

purport to set forth all of my knowledge of or investigation into this matter. Unless indicated otherwise, all conversations and statements described below are related in substance and in part and all dates are approximate.

### OVERVIEW OF RELEVANT GOVERNMENT ASSISTANCE PROGRAMS

*Pandemic Unemployment Assistance*

6. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was signed into law. The CARES Act created a temporary federal unemployment insurance program called Pandemic Unemployment Assistance ("PUA"). PUA provides unemployment insurance benefits for individuals who are not eligible for other types of unemployment benefits (*e.g.*, the self-employed, independent contractors, or gig economy workers). PUA provided payments for these benefits beginning on or after January 27, 2020 and ending before December 31, 2020, for a maximum period of 39 weeks. On or about December 27, 2020, PUA recipients were granted 13 weeks of extended benefits. The American Rescue Act has now further extended PUA benefits through September 4, 2021.

7. The Massachusetts Department of Unemployment Assistance ("DUA") administers and manages the PUA program locally. Massachusetts residents may apply to DUA for PUA benefits through an online portal over which they submit certain personally identifiable information ("PII").

8. As part of the PUA application process, the claimant provides their first and last name, Social Security number ("SSN"), date of birth, and a residential and mailing address. In addition, the claimant selects a preferred payment method: direct deposit or payment of their benefit on to a debit card. The claimant also provides a phone number and an email address to be used by DUA to provide updates, contact the claimant, and for authentication purposes.

*Paycheck Protection Program*

9.  Another source of aid provided by the CARES Act was the Paycheck Protection Program ("PPP"). The PPP provided forgivable loans to small businesses to be used for job retention and certain other business expenses. Congress initially authorized $349 billion in PPP funds and has since authorized additional funding.

10. To obtain a PPP loan, a qualifying business had to submit a PPP loan application to a participating bank. If the bank approved the loan application, the PPP loan was funded using bank monies that were fully guaranteed by the Small Business Administration ("SBA").

11. The PPP loan application required details about both the applicant's business (*e.g.*, number of employees and average monthly payroll expenses) and the authorized representative submitting the application. The PPP required applicants to acknowledge the program rules and make certain affirmative certifications, including that PPP loan funds would only be used for permissible expenses, such as payroll costs, interest on mortgages, rent, and utilities.

*Economic Injury Disaster Loans*

12. The SBA also administers the Economic Injury Disaster Loan ("EIDL") program. The EIDL program provides loans to small business that have suffered substantial economic injury due to a declared disaster. This program predates the CARES Act and has been expanded to provide relief to small businesses that experienced a loss in revenue during the pandemic.

13. To obtain an EIDL loan, a qualifying business had to submit an application directly to the SBA. If approved, the U.S. Treasury distributed funds to the applicant. As with the PPP, EIDL loan applications had to be submitted by an authorized representative and provide details about the applicant's business. The application also required the authorized representative to acknowledge the program rules and make affirmative certifications. EIDL loan proceeds were to

be used by the business for working capital, including payroll costs, salaries and sick leave, rent or mortgage payments, material costs, and preexisting business debt.

## PROBABLE CAUSE

*Fraudulent PUA Claims*

14. HIGGS resides in Dudley, Massachusetts and is the owner and operator of N&E Communications LLC, a contract telecommunications company. In this capacity, HIGGS works with CC1 and CC2, coconspirators who are not charged as defendants in the proposed Complaint.

15. I have identified 22 bank accounts at four financial institutions where HIGGS is the sole account owner: 16 at Fidelity Investments ("Fidelity"), 2 at Digital Federal Credit Union ("DFCU"), 1 at TD Ameritrade, and 3 at Bank of America.[1] In April and May 2020, HIGGS' 22 accounts received approximately 431 deposits from DUA totaling $325,552.[2] These deposits relate to approximately 87 distinct PUA claims submitted in the names and PII of individuals other than HIGGS, CC1, or CC2. For example, HIGGS' bank accounts received DUA funds based on the following PUA claims:

    a. Claim A00-000-0084-6196, dated April 29, 2020 in the name and PII of

---

[1] The 3 Bank of America accounts are in the name of Delta One Communications LLC and list HIGGS as the sole account owner. The remaining 19 accounts are in HIGGS' name and list HIGGS as the sole account owner.

[2] This amount does not include DUA funds HIGGS received from his own PUA claim. DUA records reflect that on April 23, 2020, PUA claim A00-000-0056-7511 was submitted in HIGGS' name and PII, and provided HIGGS' cellphone number (ending in 3669) and business email address. HIGGS received over $27,000 from that claim.

Victim 1, which directed payments to a HIGGS Fidelity account (ending in 8569). I interviewed Victim 1, who confirmed his name and PII on the PUA claim but stated that he did not file the claim, did not recognize the phone number or email address on the claim, and did not know HIGGS. Victim 1 further stated that he did not authorize anyone to use his PII to submit a PUA claim.

    b.  Claim A00-000-0179-4726, dated April 29, 2020 in the name and PII of Victim 2, which directed payments to another HIGGS Fidelity account (ending in 0822). I interviewed Victim 2, who confirmed his name and PII on the PUA claim but stated that he did not file the claim, did not recognize the phone number or email address on the claim, and did not know HIGGS. Victim 2 further stated that he did not authorize anyone to use his PII to submit a PUA claim.

  16.  Of HIGGS' 22 bank accounts, 21 received only DUA payments and did not receive payments from any other source, which causes me to believe that the accounts were created or maintained for the sole purpose of receiving DUA funds.

  17.  The fraudulent PUA claims directing funds to HIGGS' accounts were submitted to DUA using methods that, based on my training and experience investigating financial frauds, were designed to prevent law enforcement personnel from identifying the individual or individuals submitting the claims. First, phone numbers provided on the claims trace back to Voice over Internet Protocol ("VoIP") services, rather than to cellular or telephone companies with named subscribers.[3] Second, many of the claims listed Protonmail addresses, a Swiss email provider that gives only limited information in response to law enforcement requests. Third, the IP addresses used to submit nearly all of the fraudulent PUA claims trace back to Virtual Private Network

---

[3] A VoIP service, also known as IP telephony, allows individuals to create multiple phone numbers online that can be used to receive and send communications over the internet.

(VPN) services,[4] rather than to internet service providers with named subscribers.

18.     HIGGS regularly used a VPN service provided by Leaseweb. HIGGS submitted his PUA claim on April 23, 2020 and his business' PPP loan application on May 12, 2020 using a Leaseweb IP address, 108.62.49.158. HIGGS' business email account and personal bank accounts, including at Webster First Federal Credit Union ("Webster") and Fidelity, were also accessed in April and May of 2020 using a Leaseweb IP address, 108.62.49.152 ("the 152 IP Address").

19.     These two Leaseweb IP Addresses were also used in April and May 2020 to submit fraudulent PUA claims that directed DUA payments to HIGGS' bank accounts. For example, the 152 IP Address was used on April 29, 2020 to login to HIGGS' work email account. Two days later, on May 1, 2020, the 152 IP Address was used to access both HIGGS' Fidelity account (at 8:33 a.m.) and his personal account at Webster (at 8:36 a.m. and 8:42 a.m.). Within minutes of those bank account logins, the 152 IP Address was also used to submit fraudulent PUA claims that directed payments to HIGGS' bank accounts:

  a.     At 8:58 a.m., the 152 IP Address was used to submit PUA claim A00-000-0147-4972 in the name and PII of Victim 3. The claim directed DUA funds to one of HIGGS' Fidelity accounts (ending in 8200).

  b.     At 9:13 a.m., the 152 IP Address was used to submit PUA claim A00-000-0102-1278 in the name and PII of Victim 4. The claim directed DUA funds to another of

---

[4] A VPN service allows individuals to create a private network connection that utilizes an IP address belonging to the VPN service-provider instead of the IP address of the individual using the service.

HIGGS' Fidelity accounts (ending in 6194).

20.     HIGGS also used a VPN service provided by Total Server Solutions ("TSS") between April 29 and May 15, 2020 to access his accounts at Fidelity, Webster, DFCU, and TD Ameritrade.  One TSS IP address, 172.98.93.227 ("the 227 IP Address"), was also used during that same time period to submit multiple fraudulent PUA claims directing DUA payments to HIGGS' bank accounts.

21.     For example, the 227 IP Address was used on April 29, 2020:

   a.   between 1:15 p.m. and 2:08 p.m. to submit six PUA claims in the names and PII of others, with the proceeds directed to HIGGS' Fidelity accounts;

   b.   at 2:16 p.m. to access HIGGS' personal account at Webster; and

   c.   at 2:29 p.m. to submit a seventh PUA claim in the name and PII of another person, with the proceeds directed to one of HIGGS' Fidelity accounts.

22.     Another TSS IP Address, 172.98.93.229 ("the 229 IP Address"), was used on May 4, 2020 to access HIGGS' Fidelity account (at 6:27 p.m. and 7:09 p.m.) and HIGGS' personal account at Webster (at 8:18 p.m.).  In the approximately 42 minutes between the two logins to HIGGS' Fidelity account, the 229 IP Address was also used to submit three fraudulent PUA claims in the names and PII of others, at 6:44 p.m., 6:50 p.m., and 7:05 p.m.—each claim directed payments to HIGGS' bank accounts.

23.     HIGGS' bank statements made clear that all but one of his accounts were receiving exclusively CARES Act deposits from DUA.  For example, a single page from the statement for one of HIGGS' Fidelity bank accounts (ending in 0822) listed 22 deposits totaling more than $15,700 on only three days in May 2020:

**Deposits**

| Date | Reference | Description | Amount |
|---|---|---|---|
| 05/01 | | Deposit Ma Dua Cares Act | $917.00 |
| 05/01 | | Deposit Ma Dua Cares Act | 917.00 |
| 05/01 | | Deposit Ma Dua Cares Act | 917.00 |
| 05/01 | | Deposit Ma Dua Cares Act | 917.00 |
| 05/01 | | Deposit Ma Dua Cares Act | 317.00 |
| 05/01 | | Deposit Ma Dua Cares Act | 317.00 |
| 05/04 | | Deposit Ma Dua Cares Act | 942.00 |
| 05/04 | | Deposit Ma Dua Cares Act | 942.00 |
| 05/04 | | Deposit Ma Dua Cares Act | 942.00 |
| 05/04 | | Deposit Ma Dua Cares Act | 942.00 |
| 05/04 | | Deposit Ma Dua Cares Act | 342.00 |
| 05/04 | | Deposit Ma Dua Cares Act | 342.00 |
| 05/05 | | Deposit Ma Dua Cares Act | 942.00 |
| 05/05 | | Deposit Ma Dua Cares Act | 917.00 |
| 05/05 | | Deposit Ma Dua Cares Act | 867.00 |
| 05/05 | | Deposit Ma Dua Cares Act | 867.00 |
| 05/05 | | Deposit Ma Dua Cares Act | 867.00 |
| 05/05 | | Deposit Ma Dua Cares Act | 867.00 |
| 05/05 | | Deposit Ma Dua Cares Act | 867.00 |
| 05/05 | | Deposit Ma Dua Cares Act | 267.00 |
| 05/05 | | Deposit Ma Dua Cares Act | 267.00 |
| 05/05 | | Deposit Ma Dua Cares Act | 267.00 |
| **Total Deposits** | | | **$15,749.00** |

24. Bank records reflect that HIGGS moved quickly to transfer the fraudulent DUA funds into other bank accounts in his name. For example, between April 28 and 30, 2020, HIGGS received approximately $37,500 in fraudulent DUA deposits into his Fidelity accounts. By April 30, 2020, more than $33,000 of that amount had been wired to HIGGS' personal account at Webster. Then, between May 1 and 4, 2020, HIGGS received over $84,000 in fraudulent DUA deposits into his Fidelity accounts. By May 4, 2020, more than $71,000 of that amount had been wired to HIGGS' business and personal accounts at Webster and DFCU.

25. Bank records indicate that HIGGS then used the fraudulent DUA payments to fund his digital currency account at Coinbase, his online retail brokerage account (M1 Finance), and to pay off his and his fiancée's personal credit card debts at Chase Bank, Citibank, Capital One, Synchrony Bank, and Discover.

26. HIGGS also used fraudulent DUA funds to transfer money to and make payments for the benefit of CC1. For example, one of HIGGS' Bank of America accounts, which was funded with fraudulent DUA deposits, transferred $27,000 by check to a bank account in the name of a company owned by CC1. HIGGS' Webster business account, which was also funded with fraudulent DUA deposits, paid off CC1's auto loan of approximately $8,900.

27. Fidelity eventually froze HIGGS' accounts on suspicion of fraud. Fidelity records reveal that HIGGS contacted Fidelity using his cell phone on May 7, 2020 in an attempt to regain access to the DUA funds. I have listened to a recording of that phone call, which includes, in part, the following:

    a. HIGGS identified himself to the Fidelity agent as "Norman Higgs" and confirmed the last four digits of his cellphone number and his Fidelity username.

    b. HIGGS explained that "I have 15 to 18 accounts with you guys" and stated that he was unable to gain access to those accounts.

    c. The Fidelity agents agreed to look into the "restriction" and why it occurred. HIGGS responded, "I have a general idea . . . too many deposits and wiring out of large amount of money too fast. But I just [sic] to make sure you know it is me that is doing it, it's secured, and it's not anything crazy."

    d. The Fidelity agent asked HIGGS what exactly he was trying to do with his accounts. HIGGS responded, "Just to see what's going on. I understand like the high amount that was coming in and out. I just want to make sure you guys don't think I'm doing anything crazy illegal . . . ." The agent asked specifically whether HIGGS was trying to regain access to those funds. HIGGS responded, "Yea that's it." The agent agreed to talk to a supervisor. Before that occurred, HIGGS ended the call, claiming his phone was running out of batteries.

28. On May 11, 2020, Fidelity recalled $96,412 of the DUA funds HIGGS had transferred from his Fidelity accounts to his accounts at Webster. Because HIGGS had already spent the DUA funds for his and CC1's benefit, HIGGS used money obtained through his business' PPP and EIDL loans to repay Fidelity.

*Unlawful Use of PPP and EIDL Funds*

29. According to records from SBA, on March 31, 2020, an EIDL loan application was submitted on behalf of HIGGS' business, N&E Communications LLC. The application was submitted by "Norman Higgs" and used HIGGS' home address, phone number, and business email address. The application requested that funds be deposited into HIGGS' Webster account (ending in 1123). The Webster account received $159,900 from the U.S. Treasury on May 19, 2020.

30. According to Citizens Bank records, on May 12, 2020, a "Norman Higgs" submitted a PPP loan application on behalf of N&E Communications LLC. The application listed HIGGS' business email address, and it shows HIGGS' signature (via DocuSign) on the "Certifications and Authorizations" page, where HIGGS agreed to use "[a]ll SBA loan proceeds . . . only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule." On May 14, 2020, Citizens Bank deposited $40,300 in HIGGS' Webster account (ending in 1123).

31. As discussed above, on May 11, 2020, Fidelity recalled approximately $96,412 in fraudulently obtained DUA funds that HIGGS had received in his Fidelity accounts and transferred to Webster. Not including the May 2020 PPP and EIDL deposits for HIGGS' business, HIGGS'

Webster accounts had only approximately $10,895 in available funds. Bank records reflect that HIGGS therefore used his business' PPP and EIDL funds to satisfy the Fidelity recalls.

*Interview of HIGGS*

32. I interviewed HIGGS on August 26, 2020 in Troy, New Hampshire.

33. When I asked HIGGS about the PUA funds in his Fidelity accounts, HIGGS first stated that his email account had been hacked and that an unknown third party had opened Fidelity accounts in his name. While HIGGS admitted to accessing his Fidelity accounts and using the funds for his personal benefit, HIGGS claimed he did not know where the money came from or why it was deposited into his accounts. HIGGS explained that Fidelity later froze his accounts and recalled the money he had transferred to his Webster accounts. HIGGS told me that he authorized Webster to repay Fidelity using his business' PPP and EIDL funds.

34. At this point in the interview, I told HIGGS that it was a crime to lie to federal agents and that he needed to tell the truth. HIGGS then told me that his Fidelity account had not been hacked (and later that CC1 had told him to say that if approached by law enforcement).[5]

35. HIGGS stated that at some point during March or April 2020, HIGGS spoke to CC1 and CC2 about HIGGS' business losing money. CC1 proposed a plan to make money outside of the business that would require access to multiple bank accounts, and proposed that HIGGS, CC1, and CC2 would split the proceeds from the plan.

36. HIGGS also stated that CC1 told him to use a VPN service to access the internet

---

[5] HIGGS explained that CC1 previously worked for a competitor telecommunications company that HIGGS' company later absorbed. CCl also introduced HIGGS to CC2, with whom HIGGS then went into business.

and to contact CC1 over Telegram, an encrypted messaging platform that also provides VoIP services.

## CONCLUSION

37.     Based on the information described above, there is probable cause to believe that that HIGGS has violated the TARGET OFFENSES. A warrant for his arrest should issue.

Respectfully submitted,

_____
DOMINIC GROSS
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to telephonically before me
on  **May 3, 2021**

_____
Honorable Judith G. Dein
United States Magistrate Judge